Filed 8/7/13  In re Roberto C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| In re ROBERTO C. et al., Persons Coming Under the Juvenile Court Law. | D063641 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J514294C-D) |
| v. | |
| ALBERTO C., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

Alberto C. appeals a juvenile court order terminating parental rights to his minor son, Roberto C., pursuant to Welfare and Institutions Code section 366.26.[1] Alberto challenges the sufficiency of the evidence to support the court's finding that Roberto was adoptable. Alberto further argues that if this challenge is successful, the termination of his parental rights as to Roberto's sister, Victoria C., should also be reversed so the juvenile court can determine whether the sibling exception to adoption applies. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

The record in this case shows an extensive history of involvement by the San Diego County Health and Human Services Agency (Agency) with Alberto and the mother, Mary P., concerning Roberto and his older brother Alexander C., as well as children by other partners.[2] Roberto was the subject of an earlier dependency that began at his birth in 2008 while Mary was incarcerated. During the 18-month dependency, Roberto lived with foster parents who were also the adopted parents of Alexander and

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] Alexander was removed from Alberto and Mary's custody in 2007 as a result of being born with amphetamines in his system and Mary's admission to drug use during the pregnancy. Alberto and Mary failed to reunify with Alexander and their parental rights were terminated in September 2008. Mary's parental rights were terminated with respect to another daughter, Darlene D., in 2004. Mary also has two older children who live with their paternal grandparents and have never resided with her. Alberto's parental rights were terminated with respect to two additional children, A.D. and Karly D., who tested positive for amphetamines or methamphetamines at their births. A.D. became a dependant of the juvenile court due to neglect and substance abuse and, in 2003, parental rights were terminated as to both parents. Alberto and Karly's mother voluntarily relinquished their parental rights to Karly in July 2004.

their older half sibling Darlene. Alberto and Mary successfully reunited with Roberto in October 2010. In 2012, three-year-old Roberto was living with Alberto, Mary and Victoria, who was born in late 2011. Roberto's former foster mother, Dora J., however, continued to care for Roberto regularly. In fact, Mary left Roberto with Dora almost every weekend.

On June 8, 2012, Mary called Dora and asked her to pick up Roberto. They arranged to meet at a nearby trolley station. When Dora arrived, Mary was intoxicated and told Dora the family had been kicked out of the apartment where they were staying. Dora took Roberto with her and, at Mary's insistence, left Victoria with Mary. A few days later, the Agency received a referral alleging emotional abuse to Roberto and Victoria stemming from a domestic violence incident that occurred the day Mary left Roberto with Dora. The police report alleged Alberto and Mary were fighting with their roommate over money and the roommate's loud music, and that Mary pulled a knife on the roommate.

On June 15, 2012, an Agency social worker contacted Alberto and Mary. They told the social worker Victoria was with them and, although they were homeless, they were staying with relatives and planned to pick up Roberto soon. Because of their history with drug abuse and crime, Alberto and Mary were asked to submit to a drug test. Alberto tested positive for marijuana and Mary refused to test. That same day, Mary called Dora. During the call, Alberto took the phone and told Dora he would contact her when they were able to pick up Roberto. Dora called Alberto the following evening and

3

arranged to meet him the next morning to drop off Roberto. Alberto did not show up at the arranged time and place, and Dora contacted the Agency.

On June 20, 2012, the Agency's social worker again contacted Alberto and Mary. They refused to come to the Agency's office or provide their address. Mary told Dora she and Alberto were purposefully avoiding contact with the Agency. On July 11, 2012, the Agency filed a petition in the juvenile court on behalf of Roberto under section 300, subdivision (b). The petition alleged Roberto suffered, or was at substantial risk of, harm by the willful or negligent failure of his parents to provide him with the necessities of life, including adequate food and shelter.

On August 1, 2012, the Agency finally made contact with Alberto and Mary. They signed a safety plan concerning Victoria requiring them to stay with Alberto's niece or to notify the Agency if they were staying somewhere else. Alberto and Mary left the niece's home without notifying the Agency. After weeks of again evading the Agency, on August 26, 2012, Mary contacted Dora. Dora met both parents at a local park and found Mary intoxicated. Mary told Dora that Victoria had spent the night in Alberto's care under a bridge and that he had sexually abused Victoria. Dora took Victoria with her and contacted the Agency. On August 29, 2012, the Agency filed a petition in the juvenile court on behalf of Victoria under section 300, subdivision (b) alleging she suffered, or was at substantial risk of, harm by the parents' inability to provide regular care due to their substance abuse.

Contested jurisdiction and disposition hearings were held on September 6, 2012, for Roberto and October 31, 2012, for Victoria. At the hearings, the court assumed

4

jurisdiction, declared each child a dependant of the court and removed each from parental care. The court placed Roberto in Dora's home and Victoria in a different foster home.[3] On the Agency's recommendation in light of the parents' history of failing to reunify with their older children, the court did not provide services for them. The court ordered section 366.26 selection and implementation hearings for both children to be set within 120 days.

Contested section 366.26 hearings for Roberto and Victoria were held simultaneously on March 11, 2013. The Agency's report, submitted into evidence at the hearing, assessed Roberto as adoptable because he was young and healthy with no severe behavioral issues. The Agency's social worker reported Dora and her husband wanted to adopt both Roberto and Victoria and were committed to providing them with a safe and secure home. They also wanted Roberto and Victoria to be raised together and with their older siblings. The social worker reported Roberto had known Dora and her husband his whole life and called them mom and dad. The social worker believed Dora and her husband were capable of meeting Roberto's needs. They were proactive in "scheduling appointments with the doctor, dentist, school, and other special evaluations for developmental and behavioral concerns." The social worker who authored the report also

---

[3] After Dora took Victoria from Mary, the nine month old was fussy and hard to calm. A day later Dora noticed that Victoria's leg was swollen and took her to the hospital. There it was discovered Victoria had a fractured femur. Because the fracture was suspicious of nonaccidental injury and Victoria was under Dora's care at the time it was discovered, Victoria was placed in another foster home. The fracture was ultimately deemed to have occurred while she was in Mary's and Alberto's care, and Victoria was placed with Dora in January 2013.

testified at the hearing that both children were adoptable. She stated in addition to Dora and her husband there were 79 families in San Diego County willing to adopt a child with Roberto's characteristics, 102 families seeking to adopt a child like Victoria and 33 families seeking to adopt a sibling group like Roberto and Victoria.

At the hearing, Alberto submitted stipulated testimony that he loved Roberto and Victoria and shared an attachment with them. Alberto's counsel argued Roberto and Victoria were not likely to be adopted if parental rights were terminated, pointing to behavioral and developmental concerns set forth in the Agency's assessment of Roberto. Alberto's counsel contended the Agency's conclusion about how many families would be willing to adopt a child with Roberto's characteristics was premature because his behavioral and developmental issues had only been recently identified and had not been included into the Agency's assessment. Alberto sought guardianship or long-term foster care for Roberto and Victoria, rather than termination of parental rights.

After consideration of evidence and the arguments of counsel, the juvenile court found Roberto and Victoria were adoptable, the benefits of adoption outweighed the benefits of maintaining the parent-child relationship and terminated the parental rights of Alberto and Mary. The court also made a finding that Roberto was specifically, but not generally adoptable. The court explained it did not find clear and convincing evidence the 79 families identified by the Agency as willing to adopt Roberto would actually do so because his recently identified behavioral issues were not included in the Agency's assessment.

DISCUSSION

The focus of a dependency proceeding is to promote the best interests of the child, particularly the child's interest in a stable, permanent placement that allows the caregiver to make a full emotional commitment to the child. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Section 366.26 sets forth the procedure for permanently terminating parental rights with regard to a minor who has been removed from parental custody and declared a dependent child of the juvenile court. The statute provides "[i]f the court determines . . . by a clear and convincing standard, that is likely the child will be adopted, the court shall terminate parental rights . . . ." (§ 366.26, subd. (c)(1).) The court must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under a specified statutory exception. (*Id.*, subd. (c)(1)(A) & (B)(i)-(vi); *In re Erik P.* (2002) 104 Cal.App.4th 395, 401.) Alberto does not urge any statutory exception, but rather contends substantial evidence did not support the court's finding that Roberto was adoptable.

On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561-1562.) We give the court's adoptability finding the benefit of every reasonable

7

inference and resolve any evidentiary conflicts in favor of that finding. (*In re Y.R.* (2007) 152 Cal.App.4th 99, 112.)

The focus of the adoptability issue is the dependent child—that is, whether his or her age, physical condition and emotional state make it difficult to find a person willing to adopt. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) It is not necessary that the child already be in a potential adoptive home or "that there be a proposed adoptive parent 'waiting in the wings.' " (*Ibid.*) Usually, the fact that a prospective adoptive parent has expressed interest in adopting a dependent child is evidence that the child's age, physical condition, mental state and other relevant factors are not likely to deter individuals from adopting the child. (*Id.* at pp. 1649-1650.) In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (*Id.* at p. 1650.)

Additionally, "a section 366.26 hearing does not provide a forum for the minors' parent to contest the 'suitability' of a prospective adoptive family. Rather, what is required is clear and convincing evidence of the likelihood that the children will be adopted within a reasonable time either by the prospective adoptive family or some other family." (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) However, "[w]here the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent . . . ." (*In re Sarah*

8

*M., supra*, 22 Cal.App.4th at p. 1650.)  Legal impediments to adoption are found in

Family Code sections 8601, 8602 and 8603.[4]  (*In re Sarah M.*, at p. 1650.)

Here, substantial evidence supported the juvenile court's finding that Roberto was

likely to be adopted by his foster parents.  Dora and her husband were committed to

adopting Roberto and Victoria, and were already experienced adoptive parents who

understood the responsibilities of adoption.  They also expressed their desire for Roberto

to have a safe and secure home and for him to be raised with his siblings.  Further, during

his prior 18-month dependency, Roberto thrived in the care of Dora and her husband.

They provided appropriate care for Roberto and met his developmental, mental and

emotional needs.  Dora and her husband ensured Roberto was seen regularly by a doctor

and worked with the San Diego Regional Center to obtain developmental assistance for

Roberto.

During the current dependency, Roberto continued to thrive in his prospective

adoptive parents' home.  Dora and her husband again provided appropriate care for

Roberto.  Although Roberto displayed some concerning behaviors after his return to

Dora's home in June 2012, she and her husband were "proactive in scheduling

appointments with the doctor, dentist, school, and other special evaluations" to address

those developmental and behavioral concerns.  Indeed, Alberto concedes Dora and her

husband "have been meeting Roberto's needs since June when [Mary] left him with

---

4    These statutes provide that a prospective adoptive parent must be at least 10 years older than a child unless certain exceptions apply, a child older than 12 must consent to adoption and a prospective married adoptive parent must obtain his or her spouse's consent to the adoption.  (Family Code, §§ 8601, 8602 & 8603.)

them." Further, there was no evidence in the record of any legal impediments to adoption. Roberto's prospective adoptive parents had been foster and adoptive parents (including to two of Roberto's siblings) for many years and had an active foster home license in good standing. As part of the foster home licensing process, Dora and her husband had received criminal and child welfare history clearances.[5]

We reject Alberto's contention that because Dora and her husband had not yet been approved to adopt Roberto and Victoria, the court was precluded from finding Roberto adoptable. (See *In re Marina S.* (2005) 132 Cal.App.4th 158, 166 ["there is no requirement that an adoptive home study be completed before a court can terminate parental rights"].) The statutory scheme requires the Agency to provide the court with information to allow it to make a preliminary evaluation of the eligibility and commitment of the prospective adoptive parents to adoption. (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D) & 366.22, subd. (c)(1)(D).) This assessment includes a social history, screening for criminal records and prior referrals for child abuse or neglect, and an appraisal of the prospective adoptive parents' capability to meet the child's needs and whether they understand the legal and financial rights and responsibilities of adoption. (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D) & 366.22, subd. (c)(1)(D).) The information provided by the Agency in this case met the statutory requirements and, as described, supported the court's finding that Roberto was adoptable.

---

[5]    Alberto points out that Dora had six referrals to the agency for neglect, inferring this calls into question her ability to meet Roberto's needs. All six referrals, however, were closed as unfounded. This evidence does not undermine the ample evidence supporting the court's finding of adoptability.

10

Finally, Alberto contends a reversal of the order terminating parental rights as to Roberto requires reversal of the court's termination order with respect to Victoria. This issue is moot in light of our affirmance of the juvenile court's order with respect to Roberto and, therefore, we decline to address it.

DISPOSITION

The order is affirmed.


O'ROURKE, J.

WE CONCUR:


BENKE, Acting P. J.


AARON, J.